**Steven Art**, IL Bar: 6302319*
**Anand Swaminathan**, IL Bar: 6305088*
**Megan Pierce**, CA Bar: 314044
**Justin Hill**, IL Bar: 6342031*
steve@loevy.com
anand@loevy.com
megan@loevy.com
hill@loevy.com
LOEVY & LOEVY
311 N. Aberdeen St., 3rd Fl.
Chicago, IL 60607
Phone: (312) 243-5900
Fax: (312) 243-5902

**Grayson Clary***
gclary@rcfp.org
REPORTERS COMMITTEE
  FOR FREEDOM OF THE PRESS
1156 15th Street NW, Suite 1020
Washington, DC 20005
Phone: (202) 795-9300

*Pro hac vice admission pending*

**Michael D. Seplow** (SBN 150183)
**Paul Hoffman** (SBN 71244)
mseplow@sshhzlaw.com
hoffpaul@aol.com
SCHONBRUN SEPLOW HARRIS
  HOFFMAN & ZELDES, LLP
9415 Culver Boulevard, #115
Culver City, CA 90232
Phone: (310) 396-0731

*Counsel for Plaintiff MAYA LAU*

1

**UNITED STATES DISTRICT COURT FOR
THE CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| MAYA LAU,<br><br>            Plaintiff,<br><br>          v.<br><br>COUNTY OF LOS ANGELES; ALEX VILLANUEVA; MARK LILLIENFELD; and TIM MURAKAMI,<br><br>            Defendants. | Case No.: 2:25-cv-4766<br><br>**COMPLAINT FOR DAMAGES AND OTHER RELIEF**<br><br>**JURY TRIAL DEMANDED**<br><br>**42 U.S.C. § 1983: First Amendment; Conspiracy to Deprive Constitutional Rights; Monell; Bane Act; Civil Conspiracy.** |

Complaint

2

Pursuant to 42 U.S.C. § 1983 and 28 U.S.C. §§ 1331, 1367, Plaintiff MAYA LAU, by her undersigned attorneys, complains of Defendants ALEX VILLANUEVA, MARK LILLIENFELD, TIM MURAKAMI, and COUNTY OF LOS ANGELES, and states as follows:

## INTRODUCTION

1.    To protect a free press, the First Amendment provides virtually absolute protection for a journalist's right to publish "lawfully obtain[ed] truthful information about a matter of public significance," regardless of the information's source. *Bartnicki v. Vopper*, 532 U.S. 514, 528 (2001) (quoting *Smith v. Daily Mail Publ'g Co.*, 443 U.S. 97, 103 (1979)).

2.    From the Pentagon Papers to articles that revealed the risks of tobacco, some of the most consequential investigative reporting of the last century has relied on confidential information that powerful entities wanted to keep secret from the American public. *See N.Y. Times Co. v. United States*, 403 U.S. 713, 717 (1971) (Black, J., concurring) ("The press was protected so that it could bare the secrets of government and inform the people.").

3.    But last year, Maya Lau—a reporter who previously covered the Los Angeles County Sheriff's Department ("LASD") for the *Los Angeles Times*—learned that the Department's leadership launched a retaliatory investigation of her due to her work and referred her for criminal prosecution because of her lawful

3

reporting and coverage of deputy misconduct. *See* Keri Blakinger & Alene Tchekmedyian, *Times Reporter Was Leaked List of Problem Deputies. The Sheriff's Department Investigated Her*, L.A. Times (July 20, 2024), https://perma.cc/NKR5-XRA6.

4.    In December 2017, Ms. Lau and two then-colleagues published an article discussing a "Brady List" that was maintained by LASD. *See* Maya Lau, Ben Poston & Corina Knoll, *Inside a Secret 2014 List of Hundreds of L.A. Deputies with Histories of Misconduct*, L.A. Times (Dec. 8, 2017), https://perma.cc/HA8V-QMN2.

5.    The Brady List—named for the Supreme Court's landmark 1963 decision in *Brady v. Maryland*, which requires prosecutors to disclose evidence that could weaken the credibility of prosecution witnesses—catalogued roughly 300 LASD deputies with histories of dishonesty or other misconduct that made them open to impeachment as trial witnesses.

6.    LASD created the Brady List in order to keep track of deputies whose backgrounds could undermine their credibility if the deputies were to testify in a criminal case.

7.    Ms. Lau's reporting, which was published after months of research, documented that some deputies on the Brady List had kept their jobs—and, in

some cases, had even been promoted—despite grave misconduct, including sexual assault, fabricating evidence, and using excessive force.

8.    At the time, California had excessively strict privacy laws that were so protective of officer personnel files that even prosecutors could not access the Brady List.

9.    At a time of widespread debate around police misconduct, Ms. Lau's coverage of the Brady List provided evidence that LASD continued to employ and even reward officers with histories of misconduct. Her work provided an example of the type of critical information about deputies that was not being handed over to prosecutors or defense counsel in cases in which the deputies would testify—an apparent violation of defendants' constitutional rights.

10.    The series prompted new oversight of LASD's role in past prosecutions, *see, e.g.*, Maya Lau, Ben Poston & Corina Knoll, *D.A. Examining Past Criminal Cases Involving L.A. Sheriff's Deputies on a Secret List of Problem Officers*, L.A. Times (Jan. 12, 2018), https://perma.cc/X66B-YWRM, and helped inspire California legislation that brought greater transparency to police disciplinary records statewide, *see* Blakinger & Tchekmedyian, *supra*.

11.    But leadership at LASD was furious that its Brady List had been revealed.

Complaint

12.     Without any basis for believing that Ms. Lau had committed a crime, LASD, under then-Sheriff Jim McDonnell, opened an investigation into Ms. Lau shortly after she published her article. The investigation did not reveal any evidence suggesting that Ms. Lau had committed a crime.

13.     A few years later, after a new sheriff, Alex Villanueva, was elected and took office, LASD conducted *another* investigation into Ms. Lau as part of a broader campaign to target Villanueva's perceived opponents. *See* Alene Tchekmedyian, *L.A. County Sheriff's Unit Accused of Targeting Political Enemies, Vocal Critics*, L.A. Times (Sept. 23, 2021), https://perma.cc/3ZL8-WMNE (describing the formation of Sheriff Villanueva's "Civil Rights and Public Integrity Detail," which led retaliatory investigations into critics of the Department); Blakinger & Tchekmedyian, *supra* (reporting that the same unit investigated Lau).

14.     Like its first investigation, LASD opened this second criminal investigation only because Ms. Lau had published her article discussing the Brady List.

15.     The second investigation did not reveal that Ms. Lau had committed any crimes either. Nevertheless, LASD recommended that Ms. Lau be prosecuted for conspiracy, theft of government property, unlawful access of a computer, burglary, and receiving stolen property.

Complaint

16.     In May 2024, the California Attorney General declined to prosecute Ms. Lau, stating that there was "insufficient evidence" to merit criminal charges. Blakinger & Tchekmedyian, *supra*.

17.     LASD's unlawful investigation and referral for prosecution violated Ms. Lau's rights under the First Amendment and the California Constitution.

18.     Unfortunately, that overreach was not an isolated error. Instead, the violation of Ms. Lau's rights was the product of an unlawful conspiracy, and it was conducted pursuant to an official policy or practice of pursuing retaliatory criminal charges against perceived opponents of LASD, adopted by senior LASD officials who acted as final policymakers for the County.

19.     As the Los Angeles County Sheriff Civilian Oversight Commission documented as early as 2021, Villanueva's hand-picked Civil Rights and Public Integrity Detail—reporting "directly to the undersheriff"—was responsible for a series of retaliatory investigations "accusing public officials and other professionals who are in conflict with the department of committing crimes," investigations intended "to chill oversight of the Department, not to pursue a prosecution." L.A. Cnty. Sheriff Civilian Oversight Comm'n, Villanueva Administration's Investigation of Oversight Officials, Etc. at 1, 7 (May 27, 2021), https://perma.cc/VD9H-2EDT.

20.     The same unit was responsible for the investigation of Ms. Lau.

21.    Ms. Lau brings this suit to obtain accountability for a pattern of unconstitutional misconduct that threatens the rights of reporters and freedom of the press in Los Angeles.

**JURISDICTION AND VENUE**

22.    This action is brought pursuant to 42 U.S.C. §§ 1983 *et seq.* and California law to redress the Defendants' tortious conduct and their deprivation of Plaintiff's rights secured by the U.S. Constitution.

23.    This Court has jurisdiction over Plaintiff's federal claims pursuant to 28 U.S.C. § 1331 and supplemental jurisdiction over her state-law claims pursuant to 28 U.S.C. § 1367.

24.    Venue is proper under 28 U.S.C. § 1391(b). Defendant Los Angeles County is located within the U.S. District Court for the Central District of California, and, upon information and belief, all Defendants are residents of California. Additionally, a substantial part of the events giving rise to this case occurred within this jurisdiction—the Los Angeles County Sheriff's Department was the agency responsible for conducting the unlawful investigation into Ms. Lau.

Complaint

# PARTIES

25.     Maya Lau was an investigative journalist for the *Los Angeles Times* from 2016 to 2021. Her reporting covered LASD among other topics related to law enforcement and government.

26.     Alex Villanueva was the Sheriff of the Los Angeles County Sheriff's Department from 2018 to 2022. Sheriff Villanueva decided to open a criminal investigation into Ms. Lau.

27.     Mark Lillienfeld was a detective in the Los Angeles County Sheriff's Department in 2018. At Sheriff Villanueva's direction, Lillienfeld led the criminal investigation into Ms. Lau.

28.     Tim Murakami was an Undersheriff in the Los Angeles County Sheriff's Department in Fall 2021. Sheriff Alex Villanueva delegated to Undersheriff Murakami his decision-making authority as a final policymaker of the County in connection with the investigation into Ms. Lau. After conducting an unlawful investigation into Ms. Lau, Undersheriff Murakami referred Ms. Lau to the California Attorney General's Office for prosecution.

29.     Alex Villanueva, Mark Lillienfeld, and Tim Murakami are collectively referred to as "Individual Defendants" in this Complaint.

30.     Defendant County of Los Angeles is a municipality in California, and is and/or was the employer of each of the Defendants. The County is liable for all

torts committed by Defendants pursuant to California law. The County is also responsible for indemnifying judgments against Defendants. The County is responsible for the policies, practices, and customs of the Los Angeles County Sheriff's Department that caused the unconstitutional investigation and attempted prosecution of Ms. Lau, and Defendants Villanueva and Murakami had final policymaking authority for the relevant policies, practices, and customs of the County.

## FACTS

### Ms. Lau's Reporting

31.    On December 8, 2017, the *Los Angeles Times* published a story by Ms. Lau and two colleagues titled "Inside a Secret 2014 List of Hundreds of L.A. Deputies with Histories of Misconduct." Lau, Poston & Knoll, *supra*.

32.    The article explained that LASD maintained a "Brady List"—an inventory of roughly 300 LASD deputies with histories of dishonesty or other misconduct that made them open to impeachment as trial witnesses—but withheld it from prosecutors and the public.

33.    The article went on to describe that "Times reporters reviewed a version of the roster" and then "scoured [other] court and law enforcement records for details of how deputies landed on it." Lau, Poston & Knoll, *supra*.

Complaint

34.    The article documented numerous examples of misconduct by LASD deputies who remained employed by the Department—some of whom had continued to rise in the ranks.

35.    Casey Dowling was among the deputies whom the article discussed as having committed misconduct. Dowling sexually assaulted a 14-year-old girl while working in his capacity as an LASD deputy. The girl had been attacked with a knife and sought the deputy's help, but after Dowling moved her into his patrol car, he touched her breasts. Dowling then touched her breasts again after he drove her home. Dowling was temporarily relieved of his duties, but he was ultimately reinstated, and he was actively working for LASD's parks bureau as of August 2017.

36.    The article also reported that the Brady List included Christian Chamness, who pepper-sprayed and arrested an elderly man, then wrote a false report to justify the arrest. Chamness was suspended for 25 days for making a false report and using excessive force, but he was still employed by LASD when the article was published.

37.    Finally, the article reported that the Brady List included Timothy Jimenez, a Sergeant in LASD. When Jimenez was working as a bailiff in 1995, he warned a suspected drug dealer's girlfriend that the dealer was being watched by police. The Deputy District Attorney wrote in a memo that Jimenez's actions put

Complaint

his colleagues' lives in peril, but he was not prosecuted, and Jimenez has since been promoted within the Sheriff's Department.

38.     Ms. Lau and her colleagues spent months researching the article. They interviewed deputies and corroborated key information through the use of public records.

39.     Ms. Lau and her editors at the *Times* viewed the information—and the widespread police misconduct it documented—as a matter of clear public concern, particularly in light of the nationwide debate on police accountability and California's extreme approach to officer privacy.

40.     Ms. Lau's reporting exposed facts about deputies that had been concealed from prosecutors and defendants, in potential violation of *Brady v. Maryland*.

41.     After Ms. Lau and her colleagues published their article, the Los Angeles County District Attorney's Office launched a comprehensive review of past criminal cases that featured deputies whose names appeared on the Brady List. *See* Maya Lau, Ben Poston & Corina Knoll, *D.A. Examining Past Criminal Cases Involving L.A. Sheriff's Deputies on a Secret List of Problem Officers*, L.A. Times (Jan. 12, 2018), https://perma.cc/X66B-YWRM.

42.    In 2018, Ms. Lau and her colleagues published a follow-up series showing the damage that California's police privacy laws had done to public safety.[1]

43.    The series helped spur passage of a groundbreaking new law later that year, resulting in critical police officer personnel files being opened to public review for the first time in decades. California lawmakers calling for the measure read aloud portions of the *Times*' reporting from the Assembly floor to highlight the need for reform.

44.    The new law, California Senate Bill 1421, allowed Ms. Lau and her colleagues to gain access to documents proving that some deputies with histories of serious misconduct had indeed testified in criminal cases without prosecutors or defense counsel being informed of the deputies' prior wrongdoing.

45.    In 2019, Ms. Lau and a colleague published an article showing that a homicide detective from LASD had been disciplined for punching a suspect and then lying about it. Later, he testified in five murder trials. In all those cases, the defense attorneys told the *Times* they had never been informed that the detective had been previously disciplined for dishonesty. *See* Maya Lau & Ben Poston, *A*

---

[1]    *See* Corina Knoll et al., *An L.A. County Deputy Faked Evidence. Here's How His Misconduct Was Kept Secret in Court for Years*, L.A. Times (Aug. 9, 2018), https://perma.cc/J2TV-F42W; Maya Lau, *One Cop Came Forward to Expose Secrets in His Own Ranks. The Revelation Rocked the Court System*, L.A. Times (Aug. 14, 2018), https://perma.cc/B4TA-644Y.

Complaint

*Homicide Detective's Dishonesty Was Kept Secret for Years. Now it Could Upend Criminal Cases*, L.A. Times (Sept. 19, 2019), https://perma.cc/ZM5T-DWTS.

46.    The information uncovered by the *Times* could potentially lead to those criminal cases being overturned.

47.    In each of those respects, Ms. Lau's reporting on the Brady List played an essential role in promoting a more informed public debate on police accountability in California.

**The Initial Investigation**

48.    Upon information and belief, LASD learned around 2017 that its Brady List had been leaked.

49.    LASD—led by Sheriff Jim McDonnell at the time—began to investigate people it believed had disseminated the Brady List.

50.    LASD's investigation turned up no evidence connecting Ms. Lau to any crime.

51.    In 2018, Alex Villanueva was elected Sheriff of Los Angeles County.

52.    Shortly after he took office, Sheriff Villanueva created LASD's Civil Rights and Public Integrity Detail. Sheriff Villanueva used this group of officers to target and harass individuals who used their public positions to criticize Sheriff Villanueva and LASD.

Complaint

53.     Ms. Lau was one of the victims of the retaliatory investigations led by the Civil Rights and Public Integrity Detail.

54.     The Civil Rights and Public Integrity Detail opened a criminal investigation into Ms. Lau and referred her for prosecution without any reason to think that she had committed a crime.

55.     Since it had concluded its initial investigation into the leak of its Brady List, LASD had not uncovered any new evidence suggesting that Ms. Lau had committed a crime.

56.     Instead, when it opened a second criminal investigation into Ms. Lau, LASD relied on its stale conclusion—already disproven through LASD's first investigation—that Ms. Lau had supposedly committed a crime because she published an article discussing the Brady List.

57.     Detective Mark Lillienfeld led the second investigation into Ms. Lau.

58.     LASD's second investigation did not turn up any evidence suggesting that Ms. Lau had committed a crime.

59.     Instead, according to the *Times*' reporting, LASD's investigative report was filled with "testy asides and innuendos about Villanueva foes," evidencing a retaliatory motive for investigating the Department's perceived opponents. Blakinger & Tchekmedyian, *supra*.

Complaint

60.     Despite the lack of probable cause, Undersheriff Tim Murakami referred the case to the California Attorney General for prosecution in 2021.

61.     Sheriff Villanueva had delegated to Undersheriff Murakami the responsibility to decide what action to take as a result of LASD's investigation. This delegation made Undersheriff Murakami the final policymaker in terms of deciding whether or not to refer Ms. Lau for prosecution.

62.     Undersheriff Murakami alleged that Ms. Lau had engaged in conspiracy, theft of government property, unlawful access of a computer, burglary, and receiving stolen property.

63.     Ms. Lau did not commit any of these crimes.

64.     In May 2024, the California Attorney General declined to prosecute because there was "insufficient evidence" to merit criminal charges. Blakinger & Tchekmedyian, *supra*.

### LASD's Pattern/Practice of Retaliating Against
### Individuals Who Report Unfavorable Information About LASD

65.     The unlawful investigation into Ms. Lau was part of an unlawful policy and/or practice maintained by LASD, in which LASD leadership opened retaliatory criminal investigations and, ultimately, referred for prosecution individuals who used their public positions to criticize Sheriff Villanueva and LASD.

1    66.    This unlawful policy and practice was carried out, in part, by the Civil

2   Rights and Public Integrity Detail, which initiated numerous criminal

3   investigations into individuals who had used their public positions to criticize

4   Sheriff Villanueva and LASD.

5    67.    For example, in April 2022, Sheriff Villanueva announced that he had

6   opened a criminal investigation into *Los Angeles Times* reporter Alene

7   Tchekmedyian after she published a story detailing LASD's cover-up of a deputy's

8   use of excessive force.

9    68.    At a press conference, Sheriff Villanueva alleged that Tchekmedyian

10   could be prosecuted for conspiracy, burglary, and unauthorized use of a database.

11   Villanueva dropped the criminal investigation only after public outrage.

12    69.    Additionally, in 2021, LASD investigated journalist Cerise Castle, a

13   reporter for Knock LA, after she published a history of deputy gangs within LASD.

14   Among the investigative techniques employed by LASD, department employees

15   monitored Castle's social media accounts, compiled dossiers on individuals

16   associated with her work, and described Knock LA in internal emails as one of the

17   "anti-LASD platform(s) we are tracking."

18    70.    Sheriff Villanueva's retaliation was not limited to targeting journalists

19   who criticized his administration.

20

17

Complaint

71.    Using LASD's Civil Rights and Public Integrity Detail, Sheriff Villanueva also targeted public officials who publicly criticized his administration.

72.    For example, in August 2019, the Civil Rights and Public Integrity Detail opened a criminal investigation into Max Huntsman, the Inspector General of Los Angeles County at the time, after he published a report criticizing Sheriff Villanueva's decision to rehire a deputy who had been fired for domestic violence and dishonesty.

73.     Sheriff Villanueva had asked Huntsman not to release the report and threatened that, if the report were released, there would be "consequences." The investigation lasted years, and both state and federal prosecutors turned down repeated referrals for prosecution. As Detective Lillienfeld described in a recent deposition, he conducted "surveillance of Mr. Huntsman's home and activities," searching for trash to rummage through and questioning Huntsman's housekeeper.

74.    In March 2020, after Los Angeles County supervisors criticized Sheriff Villanueva's handling of the COVID pandemic, the Los Angeles Board of Supervisors voted to remove Sheriff Villanueva as head of the emergency operations center and replace him with the county's chief executive, Sachi Hamai.

75.    In retaliation, Sheriff Villanueva publicly harassed Hamai by, among other things, accusing her of committing a felony for serving on the board of an

Complaint

organization that had voted to support a ballot measure proposing to redirect money away from LASD.

76.     In February 2021, LASD executed a search warrant on the office of a non-profit ran by Patti Giggans, a commissioner of the Los Angeles County Sheriff Civilian Oversight Commission.

77.     The Civilian Oversight Commission—and Patti Giggans herself—had criticized Sheriff Villanueva numerous times in the prior years. For instance, the Civilian Oversight Commission requested that Sheriff Villanueva be held in contempt after he refused to appear before the Commission pursuant to a subpoena. Giggans had also publicly voiced her support for the Commission's calls for Sheriff Villanueva to resign after he resisted oversight attempts and failed to hold deputies accountable for misconduct.

78.     The Civil Rights and Public Integrity Detail also executed a search warrant on the home of Sheila Kuehl in September 2022, after she had joined calls for Sheriff Villanueva to step down.

79.     LASD's investigations into Giggans and Kuehl were baseless. Both state and federal authorities declined LASD's referrals for prosecution.

80.     George Gascón, the county's district attorney in 2021, summarized his perception of the criminal investigations led by Sheriff Villanueva and the Civil Rights and Public Integrity Detail: "He's only targeting political enemies."

Complaint

81.     LASD's pattern and practice of opening retaliatory criminal investigations and attempting to prosecute perceived critics was one of the grounds that caused then-California Attorney General Xavier Becerra to open a civil rights investigation into LASD in January 2021.

82.     The California Attorney General's investigation into LASD's retaliatory investigations remains ongoing. As of this filing, no one has been held accountable for the unlawful LASD practices that violated Ms. Lau's constitutional rights.

## DAMAGES

83.     The misconduct exhibited by the Sheriff's Department has caused significant harm to Ms. Lau and the freedom of the press.

84.     Ms. Lau's dignity and privacy were violated. She has suffered anxiety since learning about LASD's unlawful investigation.

85.     If LASD's actions are left unredressed, journalists in Los Angeles will be chilled from reporting on matters of public concern out of fear that they will be investigated and prosecuted.

86.     In addition to compensatory damages, Ms. Lau seeks nominal and punitive damages.

Complaint

**Exhaustion of State Remedies**

87.     Pursuant to Cal. Gov't Code § 910, on October 29, 2024, Ms. Lau submitted a Notice of Claims with the County detailing the allegations set forth in this Complaint.

88.     The County denied Ms. Lau's claims on November 25, 2024.

89.     Ms. Lau received notice of the County's denial on December 11, 2024.

90.     Ms. Lau now brings this lawsuit in federal court seeking justice for LASD's unlawful attempt to investigate and prosecute her.

**COUNT I**

**Retaliation**

**(First Amendment)**

*Brought Under 42 U.S.C. § 1983 Against the Individual Defendants*

91.     Each paragraph of this Complaint is incorporated as if restated fully herein.

92.     Ms. Lau engaged in constitutionally protected activity when she received the Brady List and wrote her article discussing it. *See Daily Herald Co. v. Munro*, 838 F.2d 380, 384 (9th Cir. 1988) ("[T]he First Amendment protects the media's right to gather news."); *Bartnicki v. Vopper*, 532 U.S. 514, 529–30 (2001)

(First Amendment protects publication of information on matters of public concern regardless of the source's conduct in obtaining it).

93.     The Individual Defendants opened a retaliatory criminal investigation into Ms. Lau and referred her for prosecution based solely on her protected receipt of and reporting on the list.

94.     The Individual Defendants had no reason to think that Ms. Lau was involved in criminal activity.

95.     Being subjected to a retaliatory investigation and/or referred for criminal prosecution would chill a person of reasonable firmness from exercising First Amendment rights.

96.     Even if probable cause or arguable probable cause had existed to believe Ms. Lau committed a crime, Ms. Lau was investigated and referred for criminal prosecution when otherwise similarly situated individuals not perceived as opponents of LASD have not been.

97.     While journalists routinely receive and publish leaked information, the offenses the Individual Defendants alleged against Ms. Lau have rarely if ever been applied to a reporter.

98.     By opening a criminal investigation into Ms. Lau and referring her for prosecution because she reported unfavorable information about LASD, the

Complaint

Individual Defendants engaged in unlawful retaliation against Ms. Lau in violation of the First Amendment.

99.    In doing so, the Individual Defendants acted under color of state law.

100.    In doing so, the Individual Defendants acted maliciously and with reckless disregard for Ms. Lau's constitutional rights.

**COUNT II**

**Conspiracy to Deprive Constitutional Rights**

*Brought Under 42 U.S.C. § 1983 Against All Individual Defendants*

1.    Each paragraph of this Complaint is incorporated as if restated fully herein.

2.    As set forth in the above paragraphs, Defendants Villanueva, Lillienfeld, and Murakami, acting in concert with other co-conspirators, known and unknown, reached an agreement among themselves to open an unlawful investigation into Ms. Lau and refer her for criminal prosecution.

3.    In doing so, the Individual Defendants and their co-conspirators agreed to accomplish an unlawful purpose and/or a lawful purpose by unlawful means.

4.    In addition, these co-conspirators agreed among themselves to protect one another from liability for depriving Ms. Lau of her rights.

Complaint

5.      In furtherance of their conspiracy, each of these co-conspirators committed overt acts and were otherwise willful participants in joint activity.

6.      As a result of the Individual Defendants' agreement, Ms. Lau suffered significant loss of privacy, loss of dignity, and other continuous injuries as damages, as set forth in the above paragraphs.

7.      The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, and with reckless indifference to Ms. Lau's rights.

8.      The misconduct described in this Count was undertaken pursuant to the policies and practices of Defendant County of Los Angeles in the manner more fully described below in Count III.

**COUNT III**

**Retaliation – *Monell***

**(First Amendment)**

*Brought Under 42 U.S.C. § 1983 Against Defendant County of Los Angeles*

9.      Each paragraph of this Complaint is incorporated as if restated fully herein.

10.     Defendant County of Los Angeles maintained a policy and practice of investigating and pursuing criminal charges against perceived opponents of LASD,

24

without probable cause, in retaliation for publishing unfavorable information about LASD.

11.    Policymakers acting on behalf of the County—including Sheriff Alex Villanueva and Undersheriff Tim Murakami—opened a criminal investigation into Ms. Lau and referred her for criminal prosecution without having probable cause to do so.

12.    Sheriff Villanueva and, by designation, Undersheriff Murakami acted as final policymakers for the County in deciding to open an unlawful investigation into Ms. Lau and in recommending her to be prosecuted.

13.    Being subjected to a retaliatory investigation and/or referred for criminal prosecution would chill a person of reasonable firmness from exercising First Amendment rights.

14.    As detailed above, the unlawful investigation into Ms. Lau was consistent with LASD's pattern and/or practice of retaliating against individuals who report unfavorable information about LASD, a pattern or practice that caused the violation of Ms. Lau's rights.

## COUNT IV

## Bane Act

*Brought Under California Civil Code § 52.1 Against All Defendants*

15.    Each paragraph of this Complaint is incorporated as if restated fully herein.

16.    The Bane Act authorizes individuals to sue defendants who "interfered with" or "attempted to" interfere with the exercise or enjoyment of their constitutional rights "by threat, intimidation, or coercion." Cal. Civ. Code § 52.1(b)–(c).

17.    The U.S. Constitution and the California Constitution both protect journalists from retaliatory investigation and prosecution for receiving and publishing truthful material on matters of public concern.

18.    As set forth above, by opening an unlawful investigation into Ms. Lau and referring her for criminal prosecution for constitutionally protected activity, Defendants interfered with and/or attempted to interfere with Ms. Lau's right to be free from retaliation for exercising the rights secured to her by the First Amendment and the California Constitution.

19.    Defendants acted with the specific intent to deprive Ms. Lau of her rights.

20.    Defendant County of Los Angeles is vicariously liable, pursuant to Cal. Gov't Code § 815.2, for the acts and omissions of its employees, the Individual Defendants, within the course and scope of their employment.

Complaint

# COUNT V

## Civil Conspiracy

*Brought Under California State Law Against All Individual Defendants*

21.     Each paragraph of this Complaint is incorporated as if restated fully herein.

22.     As set forth in the above paragraphs, Defendants Villanueva, Lillienfeld, and Murakami, acting in concert with other co-conspirators, known and unknown, reached an agreement among themselves to open an unlawful investigation into Ms. Lau and refer her for criminal prosecution.

23.     In doing so, the Defendants and their co-conspirators agreed to accomplish an unlawful purpose and/or a lawful purpose by unlawful means.

24.     In addition, these co-conspirators agreed among themselves to protect one another from liability for depriving Ms. Lau of her rights.

25.     In furtherance of their conspiracy, each of these co-conspirators committed overt acts and were otherwise willful participants in joint activity.

26.     The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, and with reckless indifference to Ms. Lau's rights.

Complaint

27.     As a result of the Defendants' agreement, Ms. Lau suffered significant loss of privacy, loss of dignity, and other continuous injuries as damages, as set forth in the above paragraphs.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in her favor and against all Defendants, awarding compensatory damages, nominal damages, punitive damages, attorneys' fees and costs against each Defendant, and any other relief that this Court deems just and appropriate.

## JURY DEMAND

Plaintiff, MAYA LAU, hereby demands a trial by jury pursuant to Federal Rule of Civil Procedure 38(b) on all issues so triable.

Respectfully submitted,

**MAYA LAU**

By: /s/ Megan Pierce
*One of Plaintiff's Attorneys*

Steven Art*
Anand Swaminathan*
Megan Pierce
Justin Hill*
steve@loevy.com
anand@loevy.com
megan@loevy.com
hill@loevy.com

Complaint

1  LOEVY & LOEVY
   311 N. Aberdeen, 3rd Floor
2  Chicago, Illinois 60607
   Phone: (312) 243-5900
3  Fax: (312) 243-5902

4  Grayson Clary*
   gclary@rcfp.org
5  REPORTERS COMMITTEE
     FOR FREEDOM OF THE PRESS
6  1156 15th Street NW, Suite 1020
   Washington, DC 20005
7  Phone: (202) 795-9300

8  *Application for admission pro hac vice forthcoming

9  Michael D. Seplow (SBN 150183)
   Paul Hoffman (SBN 71244)
10 mseplow@sshhzlaw.com
   hoffpaul@aol.com
11 SCHONBRUN SEPLOW HARRIS
   HOFFMAN & ZELDES, LLP
12 9415 Culver Boulevard, #115
   Culver City, CA 90232
13 Phone: (310) 396-0731

14 *Counsel for Plaintiff MAYA LAU*

15

16

17

18

19

20

Complaint